JEAN E. WILLIAMS
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

HAYLEY A. CARPENTER (CA Bar No. 312611)
KRYSTAL-ROSE PEREZ (TX Bar No. 24105931)
Trial Attorneys
Natural Resources Section
P.O. Box 7611
Washington, DC  20044
(202) 305-0242 (Carpenter)
(202) 305-0486 (Perez)
hayley.carpenter@usdoj.gov
krystal-rose.perez@usdoj.gov

PHILLIP A. TALBERT
Acting United States Attorney

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| SEQUOIA FORESTKEEPER, *et al*., | Case No. 1:21-cv-01041-DAD-BAM |
| Plaintiffs, | **DEFENDANT'S COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER [ECF No. 12] AND MOTION FOR PRELIMINARY INJUNCTION [ECF No. 7]** |
| v. | |
| UNITED STATES FOREST SERVICE, | |
| Defendant. | Date: July 21, 2021<br>Time: 1:30 p.m. PDT<br>Hon. Dale A. Drozd |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

LEGAL BACKGROUND ................................................................................................ 2

FACTUAL BACKGROUND ........................................................................................... 3

STANDARD OF REVIEW .............................................................................................. 6

ARGUMENT .................................................................................................................... 6

    I.     Plaintiffs fail to demonstrate irreparable harm ......................................... 7

    II.    Plaintiffs' are not likely to succeed on the merits of their NEPA claim................... 9

          A.    The Project does not violate Ninth Circuit precedent ........................................... 10

             1.    Green, live trees can be hazards, and the particular green trees marked under this Project are genuine hazards......................................... 11

             2.    The trees marked as hazards could strike the road if they were to fall..... 16

          B.    The timber salvage CE (CE-13) does not apply to the Project ............................ 19

    III.    The public interest will be harmed by enjoining any part of the Project, and the balance of harms tips sharply in favor of the public interest ................................... 21

CONCLUSION................................................................................................................ 25

1

2

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska Ctr. For Env't v. U.S. Forest Serv.*,
    189 F.3d 851 (9th Cir. 1999) ........................................................................... 9, 20

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ......................................................................... 6, 9

*Amoco Prod. Co. v. Gambell*,
    480 U.S. 531 (1986) ............................................................................................ 9

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ............................................................................................ 10

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
    524 F.3d 938 (9th Cir. 2008) ............................................................................. 2

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ......................................................................... 10

*Conservation Cong. v. U.S. Forest Serv.*,
    720 F.3d 1048 (9th Cir. 2013) ........................................................................... 6

*Conservation Cong. v. U.S. Forest Serv.*,
    774 F. App'x 364 (9th Cir. 2019) .................................................................... 21

*Conservation Cong. v. U.S. Forest Serv.*,
    No. 2:13-cv-1922-TLN-CMK, 2016 WL 6524860 (E.D. Cal. Nov. 3, 2016) ........... 22

*Conservation Cong. v. U.S. Forest Serv.*,
    No. 2:18-cv-2404-JAM-CKD, 2018 WL 5629335 (E.D. Cal. Oct. 30, 2018) ........... 22

*Credit Bureau Connection, Inc. v. Pardini*,
    726 F. Supp. 2d 1107 (E.D. Cal. 2010) .............................................................. 6

*Ctr. for Biological Diversity v. Salazar*,
    706 F.3d 1085 (9th Cir. 2013) ........................................................................... 3

*Earth Island Inst. v. Elliott*,
    290 F. Supp. 3d 1102 (E.D. Cal. 2017) .......................................... 10, 20, 21, 22

*Earth Island Institute v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) ........................................... 11, 17, 21, 23

*Earth Island v. Elliott*,
    318 F. Supp. 3d 1155 (E.D. Cal. 2018) ........................................................ 19, 20

*Environmental Protection Information Center v. Carlson*,
    968 F.3d 985 (9th Cir. 2020) ........................................... 1, 2, 10, 17, 19, 20

*Forest Conservation Council v. U.S. Forest Serv.*,
    No. 03-cv-0054-PCT-FJM, 2003 WL 23281957 (D. Ariz. July 9, 2003) ............... 20

*Friends of the Bitterroot v. Marten*,
    No. CV 20-19-M-DLC, 2020 WL 2062139 (D. Mont. Apr. 29, 2020) .................................. 8

*Friends of the Wild Swan v. Weber*,
    955 F. Supp. 2d 1191 (D. Mont. 2013) .............................................................................. 8

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ............................................................................................ 8

*Helena Hunters & Anglers Ass'n v. Marten*,
    No. 19-cv-106-M-DLC, 2019 WL 5069002 (D. Mont. Oct. 9, 2019) .................................. 8

*Inland Empire Pub. Lands Council v. U.S. Forest Service*,
    88 F.3d 754 (9th Cir. 1996) .............................................................................................. 9

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ............................................................................ 10, 11, 17, 25

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ....................................................................................... 18

*Lydo Enterprises, Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ........................................................................................ 7

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................................................ 6

*Nat'l Oilseed Processors Ass'n v. Browner*,
    924 F. Supp. 1193 (D.D.C. 1996) .................................................................................. 18

*Native Ecosystems Council v. Krueger*,
    No. 13-cv-167-M-DLC, 2014 WL 9954189 (D. Mont. June 4, 2014) .......................... 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................................... 21

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985) ......................................................................................... 7

*Occupy Sacramento v. City of Sacramento*,
    No. 2:11-cv-02873-MCE, 2011 WL 5374748 (E.D. Cal. Nov. 4, 2011) ......................... 7

*Pac. Rivers Council v. U.S. Forest Serv.*,
    942 F. Supp. 2d 1014 (E.D. Cal. 2013) ..................................................................... 21, 23

*Polyportables LLC v. Endurequest Corp.*,
    No. 1:16-cv-01291-DAD-SKO, 2016 WL 4679735 (E.D. Cal. Sept. 6, 2016) ............... 7

*Sierra Forest Legacy v. Sherman*,
    951 F. Supp. 2d 1100 (E.D. Cal. 2013) ........................................................................... 9

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008) ..................................................................................................... 1, 6, 9

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................................... 9

**Rules**

Fed. R. Civ. P. 65(c) .................................................................................................................. 25

**Regulations**

36 C.F.R. § 220.6(d) ........................................................................................................ 3, 18, 20

36 C.F.R. § 220.6(d)(4) ............................................................................................................... 3

36 C.F.R. § 220.6(e) .................................................................................................................... 3

36 C.F.R. § 220.6(e)(13) ...................................................................................................... 3, 20

40 C.F.R. § 1501.4 ...................................................................................................................... 2

40 C.F.R. § 1508.9 ...................................................................................................................... 2

48 Fed. Reg. 34,263 (July 28, 1983) .......................................................................................... 2

## TABLE OF ATTACHED DOCUMENTS

| Attachment 1 | **Declaration of Barbara X. Johnston** | |
|---|---|---|
| | Exhibit 1 | Scoping Letter |
| | Exhibit 2 | René Voss Email RE: Comments on the Project |
| | Exhibit 3 | Biological Evaluation |
| | Exhibit 4 | FWS Concurrence Letter |
| | Exhibit 5 | Email to René Voss RE: Contract Award |
| | Exhibit 6 | FOIA Request Response |
| | Exhibit 7 | Forest Plan Amendment Supplemental EIS |
| **Attachment 2** | **Declaration of Brian Block** | |
| | Exhibit 1 | 2012 Hazard Tree Guidelines |
| | Exhibit 2 | Plateau Hazard Timber Assessment |
| | Exhibit 3 | Plateau Roads Layout and Marking Plan |
| | Exhibit 4 | Plateau 2020 Addendum Compliance Letter |
| | Exhibit 5 | 2020 Hazard Tree Guidelines Addendum |
| **Attachment 3** | **Declaration of Alfred Watson** | |
| | Exhibit 1 | Project Map |
| **Attachment 4** | **Declaration of Darren Mahr** | |
| **Attachment 5** | **Declaration of Jess Witten** | |
| **Attachment 6** | **Declaration of Beverly Bulaon** | |
| **Attachment 7** | **Declaration of Jeremy Ellis** | |

# INTRODUCTION

Plaintiffs seek emergency relief to halt ongoing operations of the Plateau Roads Hazard Tree Project ("Plateau Hazard Tree Project" or "the Project") in the Sequoia National Forest. However, Plaintiffs received notice of this Project nearly eighteen months ago and could have sought relief well before operations began in late June. Plaintiffs now burden this Court with an emergency created by their own delay.

The Forest Service developed the Plateau Roads Project to mitigate the hazards posed by dead or dying trees and unstable live trees. The Forest Service designated each tree after individually assessing it based on a scientifically sound method for evaluating hazards. If the hazard trees are not promptly removed, they may fall on roadways blocking access, or on cars or people using those roadways, resulting in death or serious injury. These trees must be removed, and soon, in order to provide safe passage for the public, agency employees, and firefighters. Sherman Pass Road is a vital arterial route and one of the roads treated by the Project. Because of the urgent need for this Project and the Project's minimal environmental impact, the Forest Service authorized the Plateau Hazard Tree Project under a categorical exclusion (CE) that permits the Forest Service to forego extensive analysis otherwise required by the National Environmental Policy Act (NEPA).

Plaintiffs fail to meet their burden to satisfy any one – much less all four – of the elements required under *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), to justify imposition of the extraordinary remedy of a temporary restraining order or a preliminary injunction. Plaintiffs fail to show that an injunction will prevent irreparable harm. Indeed, their long delay in filing suit seriously undermines their assertion of irreparable harm and provides this Court with solid grounds to deny their Motion for Temporary Restraining Order under Local Rule 231(b) as well as both of their motions for emergency injunctive relief under *Winter*. On the merits, Plaintiffs claim that the Forest Service violated NEPA by authorizing the Project under a CE that permits roadside maintenance. Plaintiffs rely almost exclusively on *Environmental Protection Information Center v. Carlson (EPIC)*, 968 F.3d 985 (9th Cir. 2020).

But *EPIC* is readily distinguishable.  This Project is less than half the acreage of the roadside hazard tree projects challenged in *EPIC* and of a similar size to other roadside hazard tree projects where courts have affirmed the Forest Service's use of the same CE.  Additionally, the majority opinion in *EPIC* recognized that "felling a dangerous dead or dying tree right next to the road comes within the scope of the 'repair and maintenance' CE."  968 F.3d at 990.  And unlike the record that was before the Ninth Circuit in *EPIC*, the record before this Court demonstrates that the Forest Service has appropriately identified trees for removal that are genuine hazards.  Thus, Plaintiffs are not likely to succeed on the merits of their claim.

Plaintiffs also fail to demonstrate that enjoining the Plateau Hazard Tree Project is in the public interest.  To the contrary, the Project must proceed without delay because failure to remove the hazards may result in serious injury or death.  Because the Project advances numerous aspects of the public interest and has minimal adverse effect on Plaintiffs, the balance of equities clearly weighs in Defendant's favor.  The Court should deny Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction.

## LEGAL BACKGROUND

NEPA is a procedural statute; it "does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).  To satisfy NEPA's procedural requirement, an agency may prepare an Environmental Assessment (EA) to determine whether a Finding of No Significant Impact is warranted or whether to prepare an Environmental Impact Statement (EIS) that further analyzes significant effects on the environment.  40 C.F.R. §§ 1501.4, 1508.9.

Agencies may also develop CEs for classes of actions that do not have a significant environmental effect.  *Id*. § 1508.4; *see Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34,263, 34,265 (July 28, 1983) (directing agencies to develop CEs using "broadly defined criteria which characterize types of actions that, based on the agency's experience," normally do not have "significant environmental effects").  CEs allow agencies to focus their attention and

resources on major projects posing significant effects on the environment.  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (describing a CE as "a form of NEPA compliance" that "requires less than where an environmental impact statement or an environmental assessment is necessary" (citation omitted)).

The Forest Service promulgated two kinds of CEs: "actions for which a project or case file and decision memo are *not* required," 36 C.F.R. § 220.6(d) (emphasis added), and "actions for which a project or case file and decision memo are required," 36 C.F.R. § 220.6(e).  The Forest Service authorized the Plateau Hazard Tree Project under the CE for "repair and maintenance of roads, trails, and landline boundaries."  36 C.F.R. § 220.6(d)(4) ("CE-4"); *see* ECF No. 8-3 at 1.  Plaintiffs contend that the actions authorized by the Project fall within the CE for "salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than 1/2 mile of temporary road construction."  *Id*. § 220.6(e)(13) ("CE-13").  CE-4 falls within the group of actions that do not require a project file or decision memo, and CE-13 falls within the group of actions that require such documentation.  *Id.*

## FACTUAL BACKGROUND

On January 22, 2020, the Sequoia National Forest Supervisor issued a memorandum ("scoping letter") to interested parties, which included Plaintiffs' counsel René Voss and at least one member of Sequoia ForestKeeper and Earth Island Institute.  *See* Decl. of Barbara X. Johnston ("Johnston Decl."), Ex. 1, attached here as Att. 1; ECF No. 8-2.  In the January 2020 scoping letter, the Forest Supervisor explained that structurally defective trees along roadways and near recreation sites and offices posed a hazard to forest visitors and staff because the trees could fall and cause serious injury or damage.  Johnston Decl., Ex. 1.

To maintain safe roadways and sites, the Forest Service continually inspects areas to identify hazard trees and develops projects to mitigate the hazard.  *Id*.  The scoping letter described that the Forest Service's mitigation efforts would include "felling hazard trees up to 300 feet from the side of the road or around recreation and administrative sites."  *Id*.  Notably, the scoping letter identifies the very roads that are included in the Project at issue in this case.

*Id.*; *see* ECF No. 8-3.  The Forest Supervisor invited the interested parties to submit comments on the Forest Service's mitigation efforts.  Johnston Decl., Ex. 1.

On February 14, 2020, Plaintiff Sequoia ForestKeeper, through its counsel, submitted comments in response to the Forest Service's January 2020 scoping letter.  Johnston Decl., Ex. 2.  Mr. Voss expressly stated that the submission included "comments with regard to the Plateau Roadside Hazard Tree Project," which Plaintiffs challenge in this matter.  The Forest Service also received comments from other interested parties and considered all comments in developing the Project.  Johnston Decl. ¶ 4.

After receiving the comments, the Forest Service continued its environmental analysis and in May 2020 issued a Biological Evaluation and Biological Assessment for the Plateau Hazard Tree Project.  Johnston Decl., Ex. 3; ECF No. 8-1.  The Forest Service also consulted with the Fish and Wildlife Service about potential effects on federally listed species.  Johnston Decl., Ex. 4.

On June 2, 2020, the Forest Service authorized the Plateau Hazard Tree Project under CE-4 and documented its decision, despite the absence of a regulatory requirement for documentation.  ECF No. 8-3 (NEPA Checklist).  The Project aims to "fell and remove hazard trees that have potential to fail and cause injury to either people or property."  *Id.* at 1.  "Only trees or snags that have the potential to hit the roadway would be felled, approximately 200 feet either side of centerline," which was reduced from the initial proposal of 300 feet.  *See* Johnston Decl., Ex.3.  Hazard trees include "dead, dying or live trees of any size [that] are hazards to roads, campgrounds, power lines or other infrastructure" and are identified by following the Forest Service's *2012 Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region*.  *Id.*  The Forest Service also confirmed the Project's consistency with the procedures set forth in the October 2020 addenda to the *Guidelines*.  Decl. of Brian Block ("Block Decl.") ¶¶ 24-26, attached as Att. 2; Block Decl., Ex. 5.

The Project will mitigate hazards along approximately 45 miles of forest roads, including 28 miles of Sherman Pass Road—a critical arterial route that traverses the Sierra Nevada

Mountain range.  Decl. of Alfred Watson ("Watson Decl.") ¶¶ 4-5, attached as Att. 3; *see also* Watson Decl., Ex. 1; ECF No. 8-3 at 4.  The Project includes design features that will minimize or avoid adverse impacts to botanical and cultural resources, wildlife, soil and water quality, and recreation.  ECF No. 8-3 at 6-9.  For example, wildlife will be protected by specific management and conservation measures identified in the Project's Biological Assessment and the informal consultation with the Fish and Wildlife Service.  *Id.* at 7.  In particular, the Project will not adversely affect sensitive species such as mountain yellow-legged frog, the Sierra Nevada fisher, and California spotted owl.  For the mountain yellow-legged frog, the Project will implement best management practices to protect water quality, including minimizing the amount of sediment that enters aquatic features and will ensure that the Project does not alter the suitability of the existing aquatic habitat.  Johnston Decl., Ex. 4 at 3.  For the fisher, the Project will apply limited operating periods so that potential denning habitat is not disturbed during sensitive times, and the Project will not alter fisher habitat at a landscape scale, leaving extensive suitable habitat available.  *Id.* at 2-3.  And for the California spotted owl, surveys will be conducted before implementation, and limited operating periods will be applied to ensure protection of known nests.  Johnston Decl., Ex. 3 at 39.

        In September 2020, Plaintiff Sequoia ForestKeeper submitted a request for information under the Freedom of Information Act (FOIA).  Johnston Decl., Ex. 6 at 6.  Plaintiff's request sought all documents initiating or authorizing projects under certain CEs.  *Id.*  The Forest Service responded on October 29, 2020, and included the Project's decision document.  *Id.*  Plaintiff Sequoia ForestKeeper therefore has had the opportunity to challenge this Project since at least October 2020.  In November 2020, the Forest Service solicited bids for a timber sale to implement the Plateau Hazard Tree Project, but no bids were received.  ECF No. 8-4.  The Forest Service reoffered the timber sale in December 2020 and awarded a contract in January 2021.  Again, the Forest Service responded to an inquiry from Plaintiffs' counsel and informed him on January 12 that it had awarded a contract.  Johnston Decl., Ex. 5.  Plaintiffs chose to wait almost seven months to file suit.

Finally, on June 8, 2021, counsel for Plaintiffs was informed that operations were expected to begin around June 14.  ECF No. 8-6.  Plaintiffs waited nearly a month to file suit.  ECF No. 1. Operations began on June 28.  Decl. of Darren Mahr ("Mahr Decl.") ¶ 19, attached here as Att. 4.  Authorized activities are proceeding, but there has been some delay due to vandalized and stolen operator equipment in the sale area on the evening of July 13.  Decl. of Jess Witten ("Witten Decl."), attached here as Att. 5, ¶ 16.  Two 12-volt batteries and 80 gallons of fuel were stolen.  *Id.*  Forest Service Law Enforcement is conducting an investigation, and operations have resumed.  *Id.*  The timber sale contract expires on December 31, 2021.  *Id.* ¶ 10.

## STANDARD OF REVIEW

A preliminary injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  Courts must reserve this drastic remedy for cases where a plaintiff makes "a clear showing" for this relief.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  "The same standards generally apply to temporary restraining orders and preliminary injunctions."  *Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1114 (E.D. Cal. 2010).

To justify a preliminary injunction or temporary restraining order, the movant must show that "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest."  *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter*, 555 U.S. at 20).  Alternatively, "'serious questions going to the merits' and a hardship balance that tips *sharply* toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (emphasis added).

## ARGUMENT

The Court should deny Plaintiffs' Motions because (1) Plaintiffs fail to show that their members would be irreparably harmed absent injunctive relief; (2) Plaintiffs are not likely to succeed on the merits of their claim; (3) the public interest favors denying injunctive relief; and

(4) the balance of harms weighs against enjoining the Plateau Hazard Tree Project.[1]

### I. Plaintiffs fail to demonstrate irreparable harm.

Plaintiffs' long delay before seeking emergency relief "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Plaintiffs first learned about the hazard tree removal efforts a year-and-a-half ago, in January 2020, and participated in the scoping process thereafter. *See* Johnston Decl., Exs. 1, 2. The Forest Service authorized the Project in June 2020. ECF No. 8-3. As Plaintiffs' own filings show, the Forest Service provided Plaintiffs' counsel with notice of the Project as early as October 2020. *See, e.g.*, ECF No. 8-7. The Forest Service awarded the timber sale contract in January 2021 and again provided notice to Plaintiffs' counsel. Johnston Decl., Ex. 5. Yet Plaintiffs did not file suit until more than six months later. ECF No. 1. Plaintiffs' lengthy delay alone is sufficient grounds for the Court to deny Plaintiffs' Motion for Temporary Restraining Order. L.R. 231(b) ("Should the Court find that the applicant unduly delayed in seeking injunctive relief, the Court may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground."). This Court has denied a temporary restraining order based on delay alone. *See, e.g. Polyportables LLC v. Endurequest Corp.*, No. 1:16-cv-01291-DAD-SKO, 2016 WL 4679735, at *4 (E.D. Cal. Sept. 6, 2016) (finding plaintiff's 6-month delay "undercuts plaintiff's allegation of imminent, irreparable harm"); *see also Occupy Sacramento v. City of Sacramento*, No. 2:11-cv-02873-MCE, 2011 WL 5374748, at *4 (E.D. Cal. Nov. 4, 2011) (denying temporary restraining order based on 25-day delay).

Plaintiffs' eight-month delay also undermines its purported need for a preliminary injunction. *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy

---

[1] Plaintiffs' Motion for Temporary Restraining Order relies on the materials Plaintiffs submitted in support of their Motion for Preliminary Injunction, so Defendant responds to both motions in a single brief. *See* ECF No. 12 at 2.

action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action . . . ."); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc); *Friends of the Bitterroot v. Marten*, No. CV 20-19-M-DLC, 2020 WL 2062139, at *2 (D. Mont. Apr. 29, 2020) ("A delay measured in months followed by an eleventh-hour motion for a preliminary injunction calls the imminence of the alleged harm into doubt.").  Had Plaintiff promptly filed suit upon learning of the Project authorization, this case could have been fully briefed on summary judgment by now, with adequate time for the parties and the Court to address the merits of the case.  But Plaintiff did not, and its lack of urgency belies its alleged need for immediate relief.

In addition to Plaintiffs' delay weighing against a finding of imminent, irreparable harm, "timber cutting is not inherently damaging to forests and irreparable harm does not automatically arise from all environmental impacts caused by logging."  *Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191, 1195 (D. Mont. 2013), *aff'd*, 767 F.3d 936 (9th Cir. 2014).  While Plaintiffs assert that the Project's tree cutting will harm their members' interests in enjoying an undisturbed forest, their proposed order necessarily implies that tree cutting does not irreparably harm their members' interests.  *See* Pls.' Mem. in Support of Pls.' Mot. for Preliminary Injunction ("Pls. Br.") at 13-14, ECF No. 7-1.  Specifically, Plaintiffs' proposed remedy allows the Forest Service to cut "individual trees that the parties agree would likely imminently fall into a road or recreation area."  ECF No. 12-2.  Thus, Plaintiffs' ability to experience the Project area in an "undisturbed/unlogged state" cannot be the basis of their alleged harm because Plaintiffs do not seek to prevent all tree cutting or disturbance in the Project area.  And because the Project primarily targets dead or dying trees and unstable live trees, "an injunction would only prevent the Forest Service from doing what will occur through natural forces in the next few years."  *Helena Hunters & Anglers Ass'n v. Marten*, No. 19-cv-106-M-DLC, 2019 WL 5069002, at *4 (D. Mont. Oct. 9, 2019).

Plaintiffs also allege that their ability to see wildlife will be irreparably harmed.  Pls. Br. 14.  But the Project's design features will minimize or avoid potential effects to wildlife species

1  such as the mountain yellow-legged frog, fisher, and California spotted owl.  *See* ECF 8-3 at 7.

2  And, as noted above, to the extent that tree cutting would reduce Plaintiffs' ability to see

3  wildlife, such disturbance would still be present under Plaintiffs' requested relief.

4      Finally, Plaintiffs assert a procedural harm, Pls. Br. 14, even though Plaintiff Sequoia

5  ForestKeeper participated in the Project's scoping process, Johnston Decl., Ex. 2.  And Dr.

6  Hanson and Mr. Marderosian received the January 2020 scoping letter inviting comments on the

7  Forest Service's efforts to mitigate hazard trees.  *See* ECF 8-2 (noting particular members

8  "already on the lists of interested parties"); Johnston Decl., Ex. 1 (notice to "interested parties"

9  informing them of upcoming hazard tree removal project).  More importantly, "a procedural

10 injury alone is insufficient to establish injury-in-fact for standing purposes, much less to

11 demonstrate the irreparable injury required to justify injunctive relief."  *Sierra Forest Legacy v.*

12 *Sherman*, 951 F. Supp. 2d 1100, 1110-11 (E.D. Cal. 2013); *see also Amoco Prod. Co. v.*

13 *Gambell*, 480 U.S. 531, 544-45 (1986) (rejecting rule that "[i]rreparable damage is presumed

14 when an agency fails to evaluate thoroughly the environmental impact of a proposed action.").

15     Plaintiffs have failed to carry their burden to establish that imminent, irreparable harm is

16 likely.  The Court should deny the Motions on this basis alone.  *Winter*, 555 U.S. at 22; *Cottrell*,

17 632 F.3d at 1131.

18     **II.  Plaintiffs' are not likely to succeed on the merits of their NEPA claim.**

19     The Administrative Procedure Act (APA) governs a court's review of an agency's

20 compliance with NEPA.  *See Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d

21 754, 760 (9th Cir. 1996).  Under the APA, an agency action must be upheld unless it is

22 "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

23 § 706(2)(A); *see also Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir.

24 1999) ("An agency's determination that a particular action falls within one of its categorical

25 exclusions is reviewed under the arbitrary and capricious standard."); *Inland Empire Pub. Lands*

26 *Council,* 88 F.3d at 760 ("In deference to an agency's expertise, we review its interpretation of

27 its own regulations solely to see whether that interpretation is arbitrary and capricious. . . . This

28

is especially true when questions of scientific methodology are involved."). This highly deferential standard presumes the agency action to be valid. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008); *see also Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011).

The Court is "most deferential" when, as here, the agency is "making predictions, within its area of special expertise, at the frontiers of science." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

Plaintiffs claim that the Forest Service violated NEPA by (1) contravening the holding in *EPIC*, 968 F.3d 985, and (2) categorically excluding salvage harvest over 250 acres. However, the *EPIC* court's reasoning reveals important distinctions with this case and shows that the holding does not counsel granting Plaintiffs' Motions. Further, the Forest Service is not prohibited from harvesting over 250 acres of hazard trees under the roadside hazard categorical exclusion (CE-4). As explained further below, Plaintiffs' claim fails.

## A. The Project does not violate Ninth Circuit precedent.

The Plateau Hazard Tree Project is distinguishable from the project in *EPIC* for two primary reasons. First, the Project covers significantly fewer acres—approximately 2,193—than the projects challenged in *EPIC*—nearly 4,700 acres. ECF No. 8-3 at 1; 968 F.3d at 988. Courts have affirmed the Forest Service's use of the CE for projects of similar size as the one challenged here. *See, e.g.*, *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1108 (E.D. Cal. 2017) (approximately 50.2 miles of road and 3,500 acres). Importantly, *EPIC* did not establish a numerical limitation on the Forest Service's use of the CE.

Second, unlike here, the majority opinion in *EPIC* found the record in that case was insufficient to demonstrate that the trees at issue constituted a hazard. *See* 968 F.3d at 991. Here, Plaintiffs have alleged that many of the trees identified as hazards under the Project are not actually hazardous. However, their two arguments to this effect are either completely unsupported or factually incorrect. The first and more developed of these arguments is that the Forest Service has marked live, green trees as hazards and that green trees are not hazards. The

second argument is that the Forest Service has marked trees as hazards that could not reach the road if they fell.

### 1. Green, live trees can be hazards, and the particular green trees marked under this Project are genuine hazards.

In support of their first argument, Plaintiffs submit photos taken by declarants of green trees included in this Project and assert that they were improperly marked as hazards. However, the Court should not entertain these photos, which were taken by non-experts, in the face of the technical expertise possessed by Forest Service personnel. Even if the Court considers these photos, Plaintiffs are wrong in both their general assumption that green trees cannot constitute hazards and their specific allegations that photographed trees do not constitute hazards.

As a threshold matter, the Court should reject Plaintiffs' attempts to contradict the Forest Service's technical expertise through photographs and scientific judgments submitted by lay people. In situations, as here, where there are conflicting views on the science or other technical subject matter, an expert agency is permitted to rely on the views of its experts. *See Earth Island Institute*, 626 F.3d at 473 ("The district court here found just such a battle of the experts to exist, but concluded that this did not establish a violation of NEPA. It was within its authority to do so." (citation omitted)); *McNair*, 537 F.3d at 1000 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). Here, Plaintiffs try to engage in a battle of the experts because they appear to argue that live, green trees do not constitute a hazard, which runs counter to the expert opinion of the Forest Service. The *2012 Forest Service Region 5 Hazard Tree Guidelines*, which this Project followed, counsel that "[t]ree hazards include . . . dead parts of live trees, or unstable live trees (due to structural defects or other factors) that are within striking distance of people or property (a target)." Block Decl., Ex. 1. Further, the *2012 Guidelines* advise that Forest Service personnel "[l]ook at the tree from 2-3 perspectives" and use tools to assess the tree for defects, which can include many afflictions affecting green trees: "cracks, weak branch unions, stem or branch decay, cankers,

dead tree, top or branches, bark and wood boring beetles, root damage and root disease, lean and poor architecture." *Id.* at 7, 9.  The Forest Service followed these scientifically-sound methods to identify trees as hazards and included only genuine hazard trees in the Project.  Block Decl. ¶ 10 ("[N]ot all trees within the buffer area will be cut—only trees that were designated as a hazard after an individual assessment.").

But Plaintiffs' declarants are not experts, and they have not, and could not have, provided any expert analysis, given their lack of expertise in identifying hazard trees.  Ms. Sheehey's only degree is in Anthropology and her only work on forestry issues was as a seasonal wildfire technician where she performed no hazard tree-related work.  Sheehey Decl. ¶¶ 4-5, ECF No. 7-5.  While Ms. Westbrook has a degree in biology and is a teacher by profession, she does not say that she has any training in adducing tree health.  Westbrook Decl. ¶¶ 3-6, ECF No. 7-6.  In contrast, Forest Service professionals like the United States' declarant Ms. Bulaon are experts in their field, with extensive education, training, and experience in adjudging tree health and decay agents.  *See* Bulaon Decl ¶¶ 1-2 (describing Ms. Bulaon's over 20 years of experience as an entomologist for the Forest Service and her extensive educational background, including Bachelor's and Master's degrees, in her field).  Such lack of education or experience makes Plaintiffs' declarants incapable of providing a legitimate opinion as to whether green trees can ever be hazards, or whether the specific marked green trees here are hazards.  Thus, the Court should allow the Forest Service to rely on the careful, scientifically-supported judgments of its qualified experts, rather than the lay opinion of Plaintiffs' declarants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Even if the Court were to consider Plaintiffs' declarants' opinions and photographs, it must do so knowing that the photos are extremely misleading and provide an inaccurate portrayal of the hazard associated with these trees.  Decl. of Beverly Bulaon ("Bulaon Decl.") ¶¶ 5-19, attached here as Att. 6.  Even giving Plaintiffs' declarants the benefit of the doubt regarding intentions, it is readily apparent that they did not perform the careful analysis the Forest Service marking crew did, consistent with the *2012 Guidelines*, in their photography.  This discrepancy is manifest in the declaration of Beverly Bulaon, a Forest Service expert who went out into the Project area on July 8 to find as many of the trees Plaintiffs' declarants photographed as possible. *Id.* ¶ 3.  For example, Plaintiffs' photo of the tree termed "Tree 1" in the Bulaon Declaration completely obscured a large defect in the bole of the tree:

 

**Figure A**                **Figure B**

1

2

3

4

5

6

7

8

9

10

11

12

13




**Figure C**                     **Figure D**

14   Bulaon Decl. ¶¶ 5-6 (Figure A above is Plaintiffs' declarant's, and the rest were taken by the

15   Forest Service).  Ms. Bulaon explained that these photos depict an eight-foot tall defect that is

16   actively being degraded by insects, has severe heartwood degradation, and is facing the road.  *Id.*

17   ¶ 5-6.  A green tree with a similar defect has already fallen in close proximity to Tree 1.  *Id.* ¶¶ 7-

18   8.  Notably, this fallen tree was marked for removal as a hazard tree under this Project last

19   summer and has since fallen, further supporting the notion that green trees can pose an imminent

20   hazard and fall at any time.  *Id.*

21         For the second tree photographed by Plaintiffs that the Forest Service was able to find,

22   Plaintiffs' photo, again, completely hides a clear defect—a dead top that is 10-20 feet tall,

23   approximately 10 inches in diameter at its base, and leaning toward the road:

24

25

26

27

28



**Figure E**



**Figure F**

*Id.* ¶¶ 9-11 (Figure E above is Plaintiffs' declarant's, and Figure F above depicts the same tree with a truck on the adjacent road, but taken by Forest Service personnel).  Similarly, as explained more fully in Ms. Bualon's declaration, the third and fourth photographed trees the Forest Service was able to find have significant defects from fire, with the tree closest to the road having lost around 50% of its cambium, which is the material responsible for growth and survival.  *Id.* ¶¶ 12-13.  The fifth photographed tree found by Forest Service personnel is close to the road and has a dead top that is greater than ten feet in height and greater than ten inches in diameter.  *Id.* ¶¶ 14-15.  Plaintiffs' photos of this tree do not depict the adjacent road or any portion of the dead top.  *Id.* ¶ 14.  Last, the sixth photographed tree found by Forest Service personnel has two significant defects not shown in Plaintiffs' photo: a dead top (consisting of three separate pieces of wood, called leaders) and damage at the base over six feet in height.  *Id.* ¶¶ 16-18.

      Thus, Plaintiffs' pictures paint a misleading picture and fail to capture the genuine hazard that the marked green trees pose.  Though Forest Service personnel were not able to visit all of the trees photographed by Plaintiffs' declarants due to time constraints, *id.* ¶ 19, the incomplete,

but telling, survey described above should give the Court serious pause in accepting Plaintiffs'
lay photos as indicative of the hazard posed by the Project's marked trees.  Not only does a
closer examination of the exterior of the marked green trees show that they have serious defects
and constitute hazards, but a view of the interior condition of the wood from cut green hazard
trees from the Project shows additional deterioration and loss of structural integrity.




**Figure G**                                                          **Figure H**

Decl. of Jeremy Ellis ("Ellis Decl.") ¶¶ 11-12 (Figures G and H depict green trees suffering from
severe defects that have already been cut under the Project), attached here as Att. 7.

More broadly, Plaintiffs' "declarations' selective photography fail[] to capture the
abundance and density of hazard trees within the project area"—in fact, "[m]any of the trees
marked along Sherman Pass Road appear[] to be recently dead, caused by bark beetles or other
agents."  Bulaon Decl. ¶ 19.  In the Bulaon Declaration, the Forest Service provides a
representative photo of the conditions along Sherman Pass Road in the Project area; the large
size and significant number of dead trees along this frequently traveled road are readily apparent.
*Id.*  In sum, unlike the situation relied on by the Ninth Circuit majority in *EPIC*, the record
before the Court here clearly demonstrates that the trees included in the Project are genuine
hazards to the road and, therefore, properly covered by CE-4.

### 2.  The trees marked as hazards could strike the road if they were to fall.

Plaintiffs' second argument is that many of the trees covered by the Project are not

hazardous because they could not reach the road if they fell.  Pls.' Br. 10.  This argument is akin to the issue before the court in *EPIC*.  968 F.3d at 990 ("[A] number of the trees will not come close to the road even if they fall directly toward it.").  However, Plaintiffs have provided no evidence to support their claim.  All Plaintiffs provide is an unsubstantiated statement by Mr. Marderosian that "[he] saw trees that [he] thought could not possibly fall on the road, including true hazards, because they were too far from the road."  Marderosian Decl. ¶ 16, ECF No. 7-4.  Such general and unscientific statements fail to undermine the Forest Service's reasoned, supported judgement concerning the failure zone of trees for this Project, as described below.  *See Earth Island Institute*, 626 F.3d at 473 ("The district court here found just such a battle of the experts to exist, but concluded that this did not establish a violation of NEPA.  It was within its authority to do so." (citation omitted)); *McNair*, 537 F.3d at 1000.

Plaintiffs do not identify a single marked tree that allegedly is too far from the road to strike it.  But even if Plaintiffs had identified such trees, this case still would be distinguishable from *EPIC*.  Whereas the majority in *EPIC* found there was insufficient information in the record to support the notion that trees greater than their length from the road pose a hazard, here, the record clearly demonstrates that the trees marked for removal pose a hazard, and the missing piece of information regarding hazard trees greater than their length from a target has been supplied with the Forest Service Region 5's 2020 failure zone addendum.  *See* Block Decl., Ex. 5; *see also id.* ¶¶ 24-26.  The addendum provides the clear explanation that the *EPIC* majority opinion found lacking: that trees greater than a tree length to the road still pose a hazard because their potential failure zone, or "the area within which a tree or portion of a tree is likely to come to rest after falling," is generally one to one and a half times its height given "the physics of a falling tree and the structural properties of the wood in typical hazard trees."  Block Decl., Ex. 5 at 1-2; *see also id.* at 2 ("the significant momentum generated by the speed of treefall and the mass of the tree can result in large branches, and even pieces of the trunk, being sent well beyond the tree's height.").  The addendum also explains that the failure zone can sometimes be larger than one and a half times the height of a tree because of slope, wind, or potential for the falling

of a more distant hazard tree hitting and felling a tree closer to the road.  *Id.* at 3.  While this Project predates the failure zone addendum, the Forest Service has ensured the Project is consistent with the addendum.  *See* Block Decl. ¶¶ 24-26.[2]

In designing the Project, the Forest Service only considered removing trees that were within a buffer of 200 feet from the road, as this distance was determined to be not more than one and a half times the average height of trees in the Project area.  Block Decl. ¶¶ 9-10.  Even within this 200-foot buffer, trees were marked for cutting only if the marker determined that the particular tree had a moderate to high failure rating and the tree was within 1.5 times the height of the tree on the up slope side of the road or 1.25 times the height of the tree on the down slope side of the road.  Block Decl. ¶¶ 10-13 ("The marking crew then evaluated individual trees to determine if they met high or moderate hazard ratings utilizing the R5 Hazard Tree Guidelines as a reference.").  This rigorous process, combined with the 2012 and 2020 regional hazard tree guidelines, ensure that only trees with a real risk of striking the road were marked for removal.  Plaintiffs fail to even allege that this method of determining which trees might strike the road is flawed.  Given this record and the absence of any evidence from Plaintiffs that the Forest Service has marked even a single tree that is too far from the road, this case is easily distinguished from

---

[2] Importantly, the addendum did not change regional guidance on hazard tree identification but simply provided a more detailed explanation of the guidance that had already been in place (in large part due to the *EPIC* ruling).  *See* Block Decl., ex. 5 (October 2020 Hazard Tree Guideline Addenda Cover Letter).  Therefore, relying on the failure zone addendum, in addition to the declarations relied on in this section, does not constitute an impermissible post-hoc rationalization, but is instead a proper post-hoc explanation.  *See, e.g., Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996), *aff'd in part* and *remanded sub nom. Troy Corp. v. Browner,* 120 F.3d 277 (D.C. Cir. 1997) ("Post hoc rationalizations are precluded; post hoc explanations are not.").  Additionally to the extent the failure zone addendum or declarations would be outside the administrative record because they post-date the Project decision, the court may consider the documents under various exceptions to the record review rule, such as the exception to explain the agency's decision or understand technical subject matter.  *See, e.g., Lands Council v. Powell,* 395 F.3d 1019, 1030 (9th Cir. 2005).  Such post-hoc explanations are particularly appropriate in cases like this, where the regulatory regime governing the agency decision does not require documentation in support of the agency decision.  *See* 36 C.F.R. § 220.6(d) (stating that "[a] supporting record and a decision memo are not required" for projects covered by CE-4).

*EPIC.*

　　At bottom, the foregoing demonstrates that the marked trees, even the green marked trees, are hazards that must be abated.  And Plaintiffs have not submitted credible evidence sufficient to indicate otherwise.  Furthermore, Plaintiffs have not provided any detailed evidence that trees that have been marked could not reach the road if they fell.  Thus, Plaintiffs have not shown that they have a substantial likelihood of success on, or even have raised serious questions about, the merits of their NEPA claim because this Project complies with *EPIC*'s acknowledgement that marked trees must pose a hazard.[3]

### B.  The timber salvage CE (CE-13) does not apply to the Project.

　　Plaintiffs argue that CE-13 applies to this Project rather than CE-4 simply because the Project includes removal of dead trees through a timber sale.  Pls. Br. 11.  However, the Project was designed to mitigate roadside hazards and thus falls squarely within the purview of CE-4.  *See EPIC*, 968 F.3d at 990 ("We have no doubt that felling a dangerous dead or dying tree right next to the road comes within the scope of the 'repair and maintenance' CE").

　　In addition, CE-13 does not preclude the Forest Service from authorizing projects that involve a salvage component under a different CE.  In other words, the CEs are not mutually exclusive.  Indeed, courts in the Ninth Circuit have repeatedly rejected this argument and approved the use of other CEs on more than 250 acres of hazard trees along roads.  *See, e.g.*, *Earth Island v. Elliott*, 318 F. Supp. 3d 1155, 1162 (E.D. Cal. 2018) (affirming the Forest Service's use of CE-4 to fell trees along approximately 50.2 miles of roadway, removing approximately 3,500 acres); *Native Ecosystems Council v. Krueger*, No. 13-cv-167-M-DLC,

---

[3] Plaintiffs contend that the 2004 Sierra Nevada Forest Plan Amendments generally prohibit the removal of trees that are 30 inches diameter or greater.  Pls.' Br. 11 n.5.  Plaintiffs also seem to suggest that the green hazard trees marked for removal fall into this prohibition.  *Id.*  Not so.  The Plan Amendments generally prohibit removal of these larger trees only for "mechanical thinning treatments," which is inapplicable, as this Project is not a thinning project, but a project to abate hazard trees.  Johnston Decl., Ex. 7 at 8, 50.  The Forest Plan Amendments, then, reflect the Forest Service's wholly logical need to remove hazard trees safely, especially the larger ones.  In any event, forest plan compliance is a National Forest Management Act issue, a statute on which Plaintiffs do not base their Motions or any of their claims.  Pls.' Br.; Compl., ECF No. 1.

2014 WL 9954189, at *10 (D. Mont. June 4, 2014) (affirming the Forest Service's use of CE-4 to fell fire-damaged trees along roads, removing trees from 300 acres and potentially affecting 730 acres); *Forest Conservation Council v. U.S. Forest Serv.*, No. 03-cv-0054-PCT-FJM, 2003 WL 23281957, at *3 (D. Ariz. July 9, 2003) (finding "rough comparability" between CE-4 and post-fire salvage logging on 14,951 acres along roads), *aff'd*, 110 F. App'x 26, 27 (9th Cir. 2004) (holding "[i]t was not arbitrary or capricious for the agency to conclude that its 'Roads and Trails' decision fell within the parameters of categorical exclusions 31.1(b)(3), (4) and (5)," now published at 36 C.F.R. § 220.6(d).  The fact that another CE might also apply is irrelevant because CEs may overlap.  *Earth Island*, 318 F. Supp. 3d at 1180-81 (explaining that the Forest Service's decision to proceed with a project under the salvage CE did not demonstrate that it "could not *also* fit under the road-maintenance CE").  And Plaintiffs' reliance on *EPIC* is misplaced because the court expressly declined to decide this issue.  968 F.3d at 991.

Here, CE-4 was not only a reasonable choice, but it is also a better fit than CE-13 because (1) both dead and live trees have been assessed as hazards—rendering CE-13 inapplicable here, as it applies only to harvesting dead or dying trees.  *See* Block Decl. ¶ 18; 36 C.F.R. § 220.6(e)(13).  And (2) because the timber lacks commercial value, most of the Project will be implemented through grant funds—not a *commercial* timber sale as Plaintiffs assert.  *See* Watson Decl. ¶ 7.  Because the Forest Service's decision to rely on CE-4 was reasonable, Plaintiffs' argument fails.  *See Alaska Ctr. For Env't*, 189 F.3d at 857 ("We agree that an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.").

Plaintiffs also argue that CE-4 is not supported by data of past timber sales in contrast to CE-13 and that the lack of data precludes the Project from being authorized under CE-4.  Pls. Br. 12.  Again, Plaintiffs' argument has been previously rejected by this District.  *Earth Island Inst*, 290 F. Supp. 3d at 1117 n.5.  "The fact that USFS cast a wide net to expand its sample size for determining an appropriate acreage limitation for CE-13 does not change the legal analysis herein that concludes that nothing precludes USFS from applying an overlapping CE to a project

that might, if smaller in size, also qualify under CE-13." *Id.*

Finally, Plaintiffs urge the Court to take account of "practical considerations" of timber salvage operations adversely affecting the environment. *See* Pls. Br. 12. Plaintiffs do not appear to suggest that extraordinary circumstances exist but that timber harvest projects greater than 250 acres can never be categorically excluded. But the Project's design features will minimize or avoid altogether the types of adverse impacts Plaintiffs suggest could result. For example, the risk of soil erosion will be reduced by "smoothing or water-barring any ruts or trenches exceeding 6 inches in depth and 25 feet in length," and wildlife will be protected by specific management and conservation measures identified in the Project's Biological Assessment and the informal consultation with the Fish and Wildlife Service. ECF No. 8-3 at 7-8. Thus, the Project's environmental impact is minimal and was reasonably authorized under CE-4.

### III. The public interest will be harmed by enjoining any part of the Project, and the balance of harms tips sharply in favor of the public interest.

Even if Plaintiffs had demonstrated irreparable harm from the Project, or a likelihood of success or serious questions on the merits, "the Supreme Court has made clear that courts may decline to grant injunctive relief for a NEPA violation where the public interest weighs against such relief, even if that means an irreparable injury goes unaddressed." *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1025 (E.D. Cal. 2013). When one party is a United States agency, the public interest and the agency's interest merge, and the public interest weighs in favor of the agency's decision. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

The public interest strongly favors denying Plaintiffs' Motions and allowing the Plateau Hazard Tree Project to proceed and provide safe access on forest roads. *See Earth Island Institute v. Carlton*, 626 F.3d 462, 475-76 (9th Cir. 2010) (affirming denial of injunctive relief where "safety concerns" posed by roadside hazard trees to the general public and forest employees "weighed in favor of not issuing the injunction").[4] The Project must continue without

---

[4] *See also Conservation Cong. v. U.S. Forest Serv.*, 774 F. App'x 364, 368 (9th Cir. 2019) (affirming denial of injunction and finding that "steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing public roads, and in mitigating the intensity

any limitation or delay because the current state of the Forest poses serious public safety concerns.  Members of the public, Forest Service personnel and contractors, private landowners, and public safety providers, including firefighters, use the roads in the Project area and rely on them for safe passage.  Watson Decl. ¶ 11.  Structurally unsound trees may collapse unexpectedly on roadways, cars, or people, resulting in death or serious injury.  *Id*. ¶ 11-13; *see also* Mahr Decl. ¶ 29 (providing video link that shows the danger of projectiles from falling dead or dying trees).  And the deteriorating and unstable conditions resulting from falling trees could pose significant risks for firefighters and impede their efforts to fight future blazes.  *Id*. ¶ 12.  Even if a hazard tree does not fall on someone, it can pose a serious hazard when it reaches and obstructs the road.  *See* Mahr Decl. ¶ 27.  Specifically, Sherman Pass Road is a winding roadway, limiting a driver's visibility.  *Id.*  Consequently, when a driver turns a corner on this highly traveled road, the driver will not be able to react in time to avoid a hazard tree obstructing the road—potentially resulting in a catastrophic collision.  *Id.*

The Project addresses these important public safety concerns by removing hazard trees. Watson Decl. ¶ 11.  Thousands of hazard trees are along the roads used by residents, forest visitors, agency staff, and firefighters.  *Id.*.  "Given the increasing trend of large, high severity fires in the Sierra Nevada, it is quite likely that the Sherman Pass Road will be important for firefighting in years to come, and leaving hazard trees unabated along the road will put firefighters at serious risk of injury or death.  There have been multiple cases in the last 10 years where fire personnel have been seriously injured or killed by falling hazard trees."  *Id*. ¶ 12.

and severity of future fires outweighs the public interests that support an injunction.") (internal quotations omitted); *Conservation Cong. v. U.S. Forest Serv.*, No. 2:18-cv-2404-JAM-CKD, 2018 WL 5629335, at *6 (E.D. Cal. Oct. 30, 2018) ("The Forest Service and the public have a strong interest in taking proactive steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing public roads."); *Earth Island Institute v. Elliott*, 290 F. Supp. 3d 1102, 1126 (E.D. Cal. 2017) (denying preliminary injunction and explaining that the public interest "tips strongly against granting" injunctive relief given "the very serious safety concerns related to removal of hazard trees near roads and recreation sites."); *Conservation Cong. v. U.S. Forest Serv.*, No. 2:13-cv-1922-TLN-CMK, 2016 WL 6524860, at *7 (E.D. Cal. Nov. 3, 2016) (deciding injunction would harm public interest because of risk posed by hazardous trees).

Dangers posed by roadside hazard trees to the general public and forest employees weigh in favor of not issuing an injunction. *Earth Island Inst.*, 626 F.3d at 475.

Further, the Project safeguards Sherman Pass Road, a vital arterial route. Watson Decl. ¶¶ 4-5. The Forest Service must ensure safe public ingress and egress on the road. *Id.* ¶ 14. If the road were closed, emergency response crews would have to drive up to two hours more, and water delivery for suppression efforts could take up to three hours longer. *Id.* With wildfire causing widespread damage, every minute is precious time for ensuring the safety of surrounding communities. *Id.* Likewise, private landowners need safe access to their properties, and cattle ranchers need safe access to their permitted allotments. *Id.* Without the Project, some allotments could not even be accessed at all, and cattle could become trapped. *Id.*

The Project also benefits the public interest by reducing fuel loading and the associated fire hazard in the area. Watson Decl. ¶¶ 15-18. Reducing the risk of catastrophic wildfires is clearly in the public interest. *See, e.g.*, *Pac. Rivers Council*, 942 F. Supp. 2d at 1029 ("Reducing the risk of severe wildfire is in the public interest not only because of the threat wildfire poses to human lives and property, but also because of the threat it poses to wildlife."). The Forest Service uses roads as firebreaks, which eliminates the need for creating new fire lines that affect the environment. Watson Decl. ¶¶ 16-17. Contrary to Plaintiffs' assertion, Pls. Br. 16, leaving excessive fuel load along Sherman Pass Road would cause the next wildfire to burn more intensely—making it more difficult for firefighters to suppress. Watson Decl. ¶ 16. Plaintiffs' contention that the 2004 Sierra Nevada Forest Plan Amendments support leaving the felled trees on the ground is also misguided. The Amendments direct the Forest Service to "[d]etermine down woody material retention levels on an individual project basis, based on desired conditions" and to "[e]mphasize retention of wood in the largest size classes . . . ." *Id.* ¶ 18; *see also* Johston Decl., Ex. 7 at 51. The Project follows this guidance by retaining large woody debris within fuel loading limits. Watson Decl. ¶ 18. Further, Plaintiffs omit that the Forest Plan Amendments acknowledge the "desperate need to intervene in the forest to reduce the fuel loads feeding catastrophic fires" and instruct the Forest Service to limit fuel loads. Johnston Decl., Ex.

7 at 5, 52.  According to Forest Service modeling, failure to remove the hazard trees and associated fuels from the Project would result in a flame length six times greater than if this material were removed and would lead to 80 percent mortality in standing green trees.  Watson Decl. ¶ 18.  Thus, it is imperative that the Project continue.

Even a purportedly narrow injunction would result in significant harm to the public. Plaintiffs contend that their request allows the Forest Service to "avert imminent hazards."  Pls. Br. 15.  In particular, Plaintiffs ask the Court to limit felling to "individual trees that the parties agree would likely imminently fall into a road or recreation area."  ECF No. 12-2.  However, requiring the Forest Service to determine whether each individual tree is likely to fall "imminently" is simply not feasible.  *See* Watson Decl. ¶ 8.  No expert can predict with any degree of certainty that a hazard tree may likely fall within a specific timeframe.  *Id.*  Rather, the Forest Service's scientific approach evaluates a tree's level of hazard, and each tree is given a numerical rating.  *See* Block Decl. ¶¶ 16-21.  Based on the rating, the Forest Service employs its expertise to determine the need for felling the hazard tree but cannot predict exactly when a hazard tree may fail and cause severe injury or damage.  *Id.*  Given the high use and importance of these particular roads, this uncertainty counsels in favor of a cautious approach, removing all the trees that exhibit signs of moderate or high hazard according to the regional guidelines.

Plaintiffs also argue that their requested relief would "only delay any monetary gains" during the proceedings of this case.  Pls. Br. 15.  But most of the timber lacks commercial value, so the Project is being funded mostly through grant money—not *commercial* timber sale funds as Plaintiffs assert.  *See* Watson Decl. ¶ 7.  Moreover, Plaintiffs' request to enjoin any removal of felled trees from the Project area would have the practical effect of preventing any felling in the first instance because the contractor cannot be paid without removing the felled trees.  *See* Decl. Witten ¶ 9 ("In order for me to recoup my costs for the hazard tree removal work, I entered into an agreement to sell the merchantable sawlogs to Sierra Forest Products"); *id.* ¶ 12 (describing agreement with Great Basin Institute that requires the removal of cull logs—non-merchantable trees—to continue operating); *see generally* Watson Decl. ¶ 7 (explaining that the contractor gets

paid when it sells logs to the mill, and grant funds are awarded only upon removal of the cull

material). If the contractor cannot be paid, it presumably will not operate, and the hazard from

these trees continue unabated. *Id.* Even a short delay would adversely affect the Project because

the contractor has "a very limited operating window to implement this sale." Witten Decl. ¶ 17.

In sum, the public interest strongly favors allowing this important Project to move

forward without any limitation or delay. The public interest in providing for safe travel on a

major arterial road far outweighs Plaintiffs' alleged harms. The Ninth Circuit has instructed

courts not to exercise their equitable powers "loosely or casually" in environmental cases.

*McNair*, 537 F.3d at 1005. Given that the public interest and balance of equities tip sharply in

favor of proceeding with the Project, the Court should deny Plaintiffs' Motions.[5]

## CONCLUSION

Plaintiffs' months-long delay in seeking relief belies their assertion of irreparable harm

absent a temporary restraining order or preliminary injunction. Importantly, Plaintiffs have not

demonstrated that they are likely to succeed on their NEPA claim; nor have they raised serious

questions going to this claim. The Project is in the public interest because serious injury or death

could result from a hazard tree falling onto a road or a traveler—tipping the balance of equities

sharply in favor of allowing this Project to proceed. Therefore, the Court should deny Plaintiffs'

Motions for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

DATED: July 19, 2021                          JEAN E. WILLIAMS
                                              Acting Assistant Attorney General
                                              United States Department of Justice
                                              Environment & Natural Resources Division

---

[5] If the Court is inclined to grant Plaintiffs' motions, the Court should require that Plaintiffs post an appropriate bond to address the continuing threats to National Forest System lands and to public safety. *See* Fed. R. Civ. P. 65(c) (preliminary injunction or a temporary restraining order may issue "only if the movant gives security . . . ."); *Klamath-Siskiyou Wildlands Ctr. v. Heywood*, No. 2:09-cv-02252-JAM-GGH (E.D. Cal. Aug. 28, 2009) (ECF No. 40) (requiring a bond to support a temporary restraining order).

1

2                                                            */s/ Krystal-Rose Perez*
                                              HAYLEY A. CARPENTER (CA Bar No. 312611)
3                                             KRYSTAL-ROSE PEREZ (TX Bar No. 24105931)
                                              Trial Attorneys
4                                             Natural Resources Section
                                              P.O. Box 7611
5                                             Washington, DC  20044
                                              (202) 305-0242 (Carpenter)
6                                             (202) 305-0486 (Perez)
                                              hayley.carpenter@usdoj.gov
7                                             krystal-rose.perez@usdoj.gov

8                                             PHILLIP A. TALBERT
9                                             Acting United States Attorney

10                                            *Attorneys for Defendant*

11

12   OF COUNSEL

13   JAMES ROSEN
     Office of General Counsel
14   U.S. Department of Agriculture

15

16

17

18

19

20

21

22

23

24

25

26

27

28