1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEQUOIA FORESTKEEPER, et al., | No. 1:21-cv-01041-DAD-BAM |
| Plaintiffs, | |
| v. | ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER IN PART |
| UNITED STATES FOREST SERVICE, | |
| Defendant. | (Doc. No. 12) |

This matter came before the court on July 21, 2021 for a hearing on a motion for a temporary restraining order brought by plaintiffs Sequoia ForestKeeper ("SFK") and Earth Island Institute ("Earth Island") (collectively, "plaintiffs") against defendant United States Forest Service ("USFS" or "agency"). Attorneys René Voss and Matt Kenna appeared by video on behalf of plaintiffs. United States Department of Justice Trial Attorneys Hayley Carpenter and Krystal-Rose Perez and attorney James Rosen of the United States Department of Agriculture appeared by video on behalf of defendant.

Having reviewed the parties' briefing and heard oral argument, and for the reasons explained below, plaintiffs' motion for a temporary restraining order is granted in part as set forth in more detail below.

/////

1    **BACKGROUND**

2        In their complaint and briefing, plaintiffs allege the following.  The Plateau Roads Hazard

3    Tree Project (also at times referred to as the Plateau Roads Timber Sale) (hereinafter "Plateau

4    Roads Project" or the "Project") is a hazard tree removal project and commercial timber sale on

5    the Central Kern Plateau of the Sequoia National Forest that has been authorized by USFS.  (Doc.

6    No. 1 at ¶¶ 1, 19.)  The Project authorizes hazard tree mitigation along approximately 45 miles of

7    forest roads over 2,193 acres and up to 200 feet from the roads, and the commercial timber sale

8    authorizes the logging of 2.1 million board feet of timber from 1,498 acres, a subset of the

9    Project.  (*Id.* at ¶¶ 2, 20, 26; Doc. Nos. 7-1 at 14; 8-3 at 2.)

10       The National Environmental Policy Act ("NEPA") requires federal agencies to assess the

11   potential environmental effects of their proposed federal land management actions prior to

12   deciding to implement any such projects.  Compliance with NEPA can be achieved in one of

13   three ways:  the agency can prepare an environment impact statement ("EIS"); it can prepare an

14   environmental assessment ("EA"); or it can invoke a categorical exclusion ("CE").  (Doc. No. 7-1

15   at 11–12.)

16       The Plateau Roads Project was authorized pursuant to a categorical exclusion, 36 C.F.R.

17   § 220.6(d)(4) (hereinafter "CE 4").[1]  (Doc. No. 1 at ¶ 23.)  On June 2, 2020, the Deputy District

18

19   [1]  CE 4 applies to the following activities:

20           (4) Repair and maintenance of roads, trails, and landline boundaries.
        Examples include but are not limited to:

21

22           (i) Authorizing a user to grade, resurface, and clean the culverts of
        an established NFS road;

23           (ii) Grading a road and clearing the roadside of brush without the use
        of herbicides;

24

25           (iii) Resurfacing a road to its original condition;

26           (iv) Pruning vegetation and cleaning culverts along a trail and
        grooming the surface of the trail; and

27           (v) Surveying, painting, and posting landline boundaries.

28   § 220.6(d)(4).

Ranger for the Kern River Ranger District USFS issued a "NEPA Compliance Checklist" for the Project,[2] which outlines the project's purpose as follows:

> The purpose of the Plateau Roads HT project is to fell and remove hazard trees that have potential to fail and cause injury to either people or property. The project may fell and remove dead, dying or live trees of any size which are hazards to roads, campgrounds, power lines or other infrastructure, as defined by the *Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region* (USFS 2012). Trees determined to pose either a high or moderate hazard risk may be cut on about 2,193 acres and may be sold as timber, fuelwood, or commercial biomass, chips or other forest products.

(*Id.* at ¶¶ 20–21.) Plaintiffs further allege that "[a]ccording to information provided by the Forest Service, while the hazard tree guidelines were followed, hazard tree evaluation forms that document each hazard tree and its status or rating were not prepared due to the large scale of the project." (*Id.*)

In this action, plaintiffs challenge the Plateau Roads Project's authorization through CE 4, arguing that USFS violated NEPA by relying upon this categorical exclusion, which covers the repair and maintenance of roads, to authorize a large-scale tree removal and timber sale without conducting the necessary environmental analysis. (*Id.* at ¶¶ 8, 56–60.) Plaintiffs seek a temporary restraining order to preserve the *status quo* until the court can rule on plaintiffs' motion for a preliminary injunction and/or the final resolution of this case. (Doc. No. 17 at 4.) However, in their request for relief, plaintiffs clarify that they "do not object to limited tree felling of imminently hazardous trees along essential public travel corridors and in recreation sites, but without the removal of felled trees . . . until [USFS] has properly complied with NEPA." (Doc. No. 1 at ¶ 8.)

Plaintiffs initially sought to enjoin the Project through a motion for a preliminary injunction filed on July 6, 2021. (Doc. No. 7.) A hearing on that motion was scheduled for August 3, 2021. (*Id.*) In their motion for a preliminary injunction, plaintiffs indicated they "may

---

[2]  USFS utilizes two types of CEs: those which require "a case file and decision memo" and those which do not. 36 C.F.R. § 220.6(e). CE 4 is the latter type, and thus no documentation was required. (Doc. No. 16 at 9.)

1   file a motion for Temporary Restraining Order to preserve the *status quo* because Defendants

2   have already begun the logging that Plaintiffs seek to enjoin." (*Id.* at 2.)  However, plaintiffs

3   further represented at that time that the parties had been meeting and conferring in the hopes of

4   resolving the dispute without this additional motion.  (*Id.*)

5          Nonetheless, on July 15, 2021, plaintiffs filed the pending motion for a temporary

6   restraining order.  (Doc. No. 12.)  Therein, plaintiffs state that they seek to incorporate their

7   arguments raised in their July 6, 2021 motion for a preliminary injunction into the pending

8   motion for a temporary restraining order.  (Doc. No. 12 at 2.)  On July 19, 2021, the government

9   filed a combined opposition to both plaintiffs' motion for a temporary restraining order and to the

10  motion for a preliminary injunction.  (Doc. No. 16.)  On that same day, plaintiffs filed their reply

11  in support of the motion for a temporary restraining order.  (Doc. No. 17.)

12                                    **LEGAL STANDARD**

13         The standard governing the issuing of a temporary restraining order is "substantially

14  identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Intern. Sales Co. v.*

15  *John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for

16  preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

17  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

18  balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans,*

19  *Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council,*

20  *Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

21  Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just

22  possible, in order to obtain a preliminary injunction."); *Am. Trucking Ass'n, Inc. v. City of Los*

23  *Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

24         The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff

25  demonstrates . . . that serious questions going to the merits were raised and the balance of

26  hardships tips sharply in the plaintiff's favor."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d

27  1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir.

28  /////

                                                    4

2008) (*en banc*)).[3]  The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.")  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

## ANALYSIS

Plaintiffs challenge the Plateau Roads Project's authorization by way of CE 4, a categorical exclusion allowing for road repair and maintenance, which they argue for multiple reasons (including due to the edicts of recent binding precedent) cannot be employed to authorize a large scale tree removal and timber sale project of this type.  (Doc. Nos. 1 at ¶ 3; 7-1 at 14–15.)

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, __U.S.__, 140 S. Ct. 1891, 1905 (2020) (internal quotation marks and citation omitted).  Only "final agency actions" are reviewable under the APA.  5 U.S.C. § 704; *see also* 5 U.S.C. § 701 (for purposes of the APA's judicial review provisions, "agency action" has "the meaning[] given" by § 551).  An "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  The APA "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious."  *Regents*, 140 S. Ct. at 1905 (internal quotation marks and citation omitted).  An agency's "determination in an area involving a 'high level of technical expertise'" is to be afforded deference.  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*) (citing 5 U.S.C. § 706(2)(A)), *overruled on other*

---

[3]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

*grounds by Winter*, 555 U.S. 7.  The district court's role "is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'"  *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Under § 706 of the APA, the court is "to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Regents*, 140 S. Ct. at 1905 (internal quotation marks and citation omitted).  "Factual determinations must be supported by substantial evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection between facts found and conclusions made.'"  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (citation omitted).

> This requires the court to ensure that the agency has not, for instance, "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*McNair*, 537 F.3d at 987 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Under the APA,  "[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999).

As noted, plaintiffs must make a sufficient showing as to all four prongs of the *Winter* test in order to be entitled to the requested preliminary relief.  *All. for the Wild Rockies*, 632 F.3d at 1135.  Below, the court addresses those factors and plaintiffs' showing with respect to each.

**A.     Standing**

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  To satisfy the case or controversy requirement, plaintiffs must show that they have suffered an injury-in-fact that is concrete and particularized; that the injury is traceable to the challenged action of defendants; and

that the injury is likely to be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004).  In a case brought pursuant to an environmental-protection statute, such as NEPA, the requisite injury for standing purposes is an injury to the plaintiff, not to the environment. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000).  Where plaintiffs seek to enforce a procedural right, the standard for redressability is relaxed.  *Lujan*, 504 U.S. at 573.  An association may bring suit on its members' behalf if:  "[1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit."  *Friends of the Earth*, 528 U.S. at 169.

Plaintiffs have submitted declarations from members of their organizations who describe their use and enjoyment of the lands implicated within the Project area and the harm the Project would allegedly cause to their recreational and esthetic interests.  (Doc. Nos. 7-3 at ¶¶ 7–8, 12; 7-4 at ¶¶ 13–14, 18–19; 7-5 at ¶¶ 9, 11–12, 16; 7-6 at ¶¶ 11–14.)

Defendant does not appear to seriously contest plaintiffs' standing to bring this suit.  Here, the court finds that plaintiffs' members have established standing and therefore, plaintiffs have established their associational standing to bring this action.

**B.      Likelihood of Success on the Merits**

In their pending motion for a temporary restraining order, plaintiffs advance multiple arguments as to why they are likely to succeed on the merits of their NEPA claim.  (Doc. No. 7-1 at 14–17.)  First, they assert that the reliance upon this categorical exclusion to authorize a project of this type and scope clearly violates recent Ninth Circuit precedent, *Environmental Protection Information Center v. Carlson*, 968 F.3d 985 (9th Cir. 2020) ("*EPIC*").  Second, they argue that USFS cannot use a categorical exclusion to authorize a timber salvage project of over 250 acres in size.  Plaintiffs also challenge USFS's method of evaluating hazard trees, arguing that green trees "pose little or no hazard" unlike trees that are dead or dying and by identifying certain trees marked as hazards by USFS, which they argue exemplify USFS's over-designation of green trees.

/////

1    In response, USFS asserts that the Ninth Circuit's decision in *EPIC* is readily

2    distinguishable from this case due to (1) the smaller size of the Plateau Roads Project than that at

3    issue in *EPIC* and (2) the more robust record now before this court demonstrating USFS has

4    appropriately identified hazard trees for removal in connection with this Project.  (Doc. No. 16 at

5    15–27.)  Second, USFS defends its decision to rely upon CE 4 in this regard and reiterates that the

6    categorical exclusion that plaintiffs contend would limit the scope of this Project was not invoked

7    for its authorization, and thus is not applicable here.  Finally, USFS argues that the green trees

8    marked for felling are hazards that must be abated, addressing specifically some of the green trees

9    plaintiffs have identified as improperly designated for felling.  The parties' arguments are

10   addressed in turn below.

11       1.    The Applicability of *EPIC*

12       This case comes before the court close in time following the Ninth Circuit's ruling in

13   *EPIC*.  Therein, the Ninth Circuit reversed a district court's denial of a preliminary injunction and

14   held that CE 4 could not be used to authorize an "extensive commercial logging project" that

15   allowed for the logging of millions of board feet of timber on nearly 4,700 acres of National

16   Forest Land.  *EPIC,* 968 F.3d at 988.  The timber salvage project at issue in *EPIC* allowed for the

17   felling of commercially valuable, fire-damaged trees within "one and a half tree-heights of the

18   road."  *Id.* at 991.  Specifically, that project included those trees "within 200 feet of the centerline

19   of the road that has been partially burned and has a 50 percent or higher probability of mortality

20   [were] eligible for felling."  *Id.*  The Ninth Circuit determined that the project did not qualify for

21   the categorical exclusion for road maintenance and repair, other than with respect to those trees

22   "right next to the road," observing:

23       **We have no doubt that felling a dangerous dead or dying tree
         right next to the road comes within the scope of the "repair and
24       maintenance" CE.**  But the Project allows the felling of many more
         trees than that.  The rationale for a CE is that a project that will have
25       only a minimal impact on the environment should be allowed to
         proceed without an EIS or and EA.  The CE upon which the Forest
26       Service relies authorizes projects for such things as grading and
         resurfacing of existing roads, cleaning existing culverts, and clearing
27       roadside brush.  **A CE of such limited scope cannot reasonably be**

28   /////

8

**interpreted to authorize a Project such as the one before us, which allows logging of large trees up to 200 feet away from either side of hundreds of miles of Forest Service roads.**

*Id.* at 990 (emphasis added.)  One aspect of the Ninth Circuit's analysis in *EPIC* rested on the notion that CE 4 could not be used to authorize the project since it only covered the repair and maintenance of roads and "a number of the trees" to be felled as a part of the project "will not come close to the road even if they fall directly toward it."  *Id.*  The court reversed the denial of the plaintiffs' motion for a preliminary injunction and remanded the case to the district court, concluding that the USFS was required to prepare an EIS or EA to comply with NEPA as to that project.  *Id.* at 991. Thereafter, and "in large part due to the *EPIC* ruling," USFS issued the 2020 Hazard Tree Guidelines Addendum, which USFS asserts "did not change regional guidance on hazard tree identification but simply provided a more detailed explanation of the guidance that had already been in place."  (Doc. Nos. 16 at 24 n.2; 16-2 at 63–73.)

Here, the parties do not meaningfully dispute that the project at issue in *EPIC* is very similar to the Plateau Roads Project.[4]  The court similarly concludes that the pending case appears to be a nearly identical factual situation to that presented in *EPIC*.  At the hearing on the pending motion, USFS made clear that the agency does not agree with the Ninth Circuit's ruling in *EPIC*, and the 2020 addendum to their Hazard Tree Guidelines was intended to address the concerns raised by that decision and to provide better support for USFS's determinations that trees can fall at a distance significantly greater than the height of the tree itself.  Thus, defendant ultimately does not attempt to distinguish *EPIC* from this case, so much as to challenge the underpinning of that decision directly.

Plaintiffs bear the burden of demonstrating that they are likely to succeed on the merits of this action or, at the very least, that "serious questions going to the merits were raised."  *All. for the Wild Rockies*, 632 F.3d at 1131.  As to this prong, the court finds that plaintiffs have made a strong showing of likelihood of success.  The *EPIC* case appears to be directly controlling, and the court finds defendant is unable to convincingly distinguish it from the present case.  While it

---

[4]  At the hearing, it became clear to the court that while the government wishes to distinguish the holding in *EPIC*, the similarity of these two projects—other than their size—is not in dispute.

1   is correct that the Ninth Circuit in *EPIC* did not set a numerical limit on the size of project the

2   USFS may rely upon CE 4 to authorize, the decision does appear to limit the USFS under CE 4 to

3   fell only those trees likely to strike a roadway.  This scope of this Project, like that in *EPIC*,

4   appears to be far, far broader than those limitations delineated in CE 4.[5]  Following the guidance

5   and binding precedent of the Ninth Circuit as articulated in *EPIC*, the Plateau Roads Project

6   would similarly necessitate either an EIS or EA in order to comply with NEPA.

7          The court has reviewed the agency's 2020 Hazard Tree Guidelines Addendum but does

8   not find that it provides any basis upon which to depart from controlling precedent or to justify

9   the scope of this Project under the authority of CE 4.  (Doc. 16-2 at 63–73.)  This addendum is

10  described as providing additional support for the same arguments that were rejected by the Ninth

11  Circuit in *EPIC*, but that addendum is devoid of scientific evidence or references.  Instead, the

12  addendum is rather brief and conclusory, and much of the language appearing therein remains

13  inconclusive:  "[o]ther factors such as wind and 'the domino effect' *may* warrant an enlarged

14  failure zone"; "the default radius of a tree's potential failure zone is one to one and a half times

15  the tree's height . . . due in part to the physics of a falling tree and the structural properties of the

16  wood in typical hazard trees. . .." (*Id.* at 71–73)(emphasis added.)  Rather than provide a factual

17  basis to depart from the decision of the Ninth Circuit in *EPIC*, this addendum simply appears to

18  embrace the dissenting opinion in *EPIC*, which obviously does not control.[6]

19         The court is not convinced that the agency may as a matter of law distinguish the Ninth

20  Circuit's binding precedent in *EPIC* by supplying more information in support of arguments that

21  were explicitly rejected.  Nor would the court be moved to do so in this case due to defendant's

22  very limited and insufficient showing.

23  _____

24  [5]  Counsel for plaintiffs noted that they had not yet been able to review the entire Project area, but
    they estimated that between 25% to 33% of the trees marked to be felled are not within striking

25  distance of a road under the reasoning of the court in *EPIC*.

26  [6]  The court also does not question defendant's contention that each tree was individually
    evaluated pursuant to the agency's guidelines and the addendum and was determined to be within

27  striking distance of a road under those standards.  The court merely clarifies that this additional
    evaluation does not appear to be sufficient to distinguish *EPIC* where individual evaluations of

28  each tree were also conducted.

2.      Plaintiffs' Arguments Regarding CE 13 and Green Hazard Trees

The court does not find plaintiffs' remaining arguments to be persuasive or sufficient to demonstrate that there are "serious questions" as to whether they form a basis for a NEPA violation.  Plaintiffs point to another categorical exclusion, 36 C.F.R. § 220.6(e)(13) ("CE 13") for the proposition that the USFS may not authorize timber salvage projects that exceed 250 acres (*see, e.g.*, Doc. No. 1 at 12–13); however, CE 13 was not relied upon for the Project's authorization.  That another CE—that was not invoked or relied upon to permit this Project— might also not be permissible to authorize this Project is irrelevant to the determination of whether USFS violated NEPA in choosing to rely on CE 4 in this instance.  *See EPIC*, 968 F.3d at 991.

Plaintiffs' arguments and proffered evidence attempting to show that green trees cannot pose a hazard are also unpersuasive.  The court concludes that USFS has made a compelling showing that their methodology used to evaluate whether a tree is a hazard is sound.  The court makes this determination not only because the court is "most deferential" when an agency is "making predictions, within its area of special expertise, at the frontiers of science," but also due to the evidence the USFS has presented, which rebuts and undermines plaintiffs' contentions in this regard.  *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *see also Lands Council v. McNair*, 537 F.3d at 993.

In the end, based upon binding Ninth Circuit precedent and the evidence presented to date, the court finds that plaintiffs have demonstrated likelihood of success as to this theory of liability with respect to their NEPA claim.

**C.    Irreparable Harm**

Having found that plaintiffs have shown a likelihood of success on the merits, the court now turns to whether plaintiffs have also shown a likelihood that they will suffer irreparable harm in the absence of the granting of preliminary injunctive relief.  The risk of irreparable harm must be "likely, not just possible."  *All. for the Wild Rockies*, 632 F.3d at 1131.  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Here, plaintiffs assert that they are acting to prevent the irreparable environmental harm to "ecologically critical habitat" that would occur absent the granting of a temporary restraining order preventing the Plateau Roads Project from going forward until USFS complies with NEPA. (Doc. Nos. 7-1 at 17; 12 at 3.)  Plaintiffs argue that environmental injury cannot be adequately remedied by money damages and thus, the removal of trees from the landscape would constitute irreparable harm.  (Doc. No. 7-1 at 17) (citing *Lands Council*, 537 F.3d at 1004; *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003); *Sierra Club v. Eubanks*, 335 F. Supp. 2d 1070, 1083 (E.D. Cal. 2004); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1382 (9th Cir. 1998).)  Plaintiffs describe how their members would be unable to view, experience or use the land nor could members conduct research or recreational pursuits absent an injunction.  (Doc. No. 7-1 at 16–17.)  Lastly, plaintiffs argue that the improper use of a categorical exclusion to authorize the Project prevented them from providing comments or seeking redress through an agency's process in an attempt to mitigate their concerns with the project, all of which would have been required through the NEPA review process.  (*Id.* at 18.)

In opposition, defendant argues that plaintiffs needlessly delayed seeking the court's involvement, and have thereby undermined their argument that irreparable harm is imminent or irreparable.  (Doc. No. 16 at 11, 13–14.)  They argue that plaintiffs first learned of the Plateau Roads hazard tree removal efforts and participated in the scoping process as early as January 2020 and plaintiffs were aware that the project was authorized using CE 4 as early as October 29, 2020.  (*Id.* at 11, 13.)  Defendant also disputes that logging actually presents irreparable harm given the type of relief plaintiffs request in this action, which allows for some trees to be felled. (Doc. No. 16 at 14.)  On this point, defendant argues that "timber cutting is not inherently damaging to forests and irreparable harm does not automatically arise from all environmental impacts caused by logging."  (*Id.*) (citing *Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191, 1195 (D. Mont. 2013), *aff'd*, 767 F.3d 936 (9th Cir. 2014)).  They further assert that "an injunction would only prevent the Forest Service from doing what will occur through natural forces in the next few years."  (Doc. No. 16 at 14) (citing *Helena Hunters & Anglers Ass'n v. Marten*, No. 9:19-cv-106-M-DLC, 2019 WL 5069002, at *4 (D. Mont. Oct. 9, 2019)).  Finally,

1    defendant questions whether there will be any potential negative effects upon plaintiffs or their

2    members' ability to see wildlife given the mitigation efforts defendant has undertaken to protect

3    the Pacific fisher, mountain yellow-legged frog, and the California spotted owls.  (Doc. No. 16

4    at 15.)

5          In reply, plaintiffs respond that their delay in moving for this temporary restraining order

6    was caused by various factors including:  "misinformation by the Forest Service, COVID

7    restrictions, forest closures due to fire risk and an actual fire, and for judicial efficiency."  (Doc.

8    No. 17 at 4.)  They also describe how they attempted to negotiate with defendant to avoid the

9    need for bringing an emergency motion, but those efforts were ultimately not successful.  (*Id.*

10   at 11.)

11         The court finds that plaintiffs have failed to persuasively explain why they did not move

12   for an injunction prior to the Project's proposed June 14, 2021 start date.  However, the court is

13   also unpersuaded by defendant's arguments regarding how to construe plaintiffs' delay.  It is

14   generally true that "[a] delay in seeking a preliminary injunction is a factor to be considered in

15   weighing the propriety of relief."  *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211,

16   1213 (9th Cir. 1984).  In the context of this case, however, the timing issue is less concerning

17   because much of the delay occurred in the period before the alleged harm was scheduled to begin,

18   and due to its own various delays, the Project has only very recently begun.[7]  Indeed, plaintiffs

19   timely filed a motion seeking a preliminary injunction just one day after they became aware that

20   the project work had commenced, and they filed the instant motion only a few hours after the

21   parties' attempts at informally negotiating a stay of the Project reached an impasse.  (Doc. No. 12

22   at 3.)

23         Although plaintiffs' requested relief allows for imminently dangerous trees to be felled,

24   this does not appear to be a concession by plaintiffs regarding their potential harm were a

25   temporary restraining order not to be issued.  As stated by SFK member Alison Sheehey:

26

27   [7]  The court also observes that plaintiffs sought to enjoin a large number of projects, including
     this one, in another action pending in this district, which was filed on March 26, 2021, and therein
     plaintiffs sought, but were denied, preliminary injunctive relief May 28, 2021.  *See Unite the*

28   *Parks, et al., v. U.S. Forest Serv., et al.*, 1:21-cv-518-DAD-HBK.

> Our requested injunctive relief, which would allow some limited felling of trees that pose immediate hazards while proper NEPA review is completed, was simply an attempt to make our request reasonable.  Cutting such trees does in fact cause me irreparable harm, but being aware that harms are balanced I am willing to suffer such harm for both the sake of public safety and so that our injunction request, which would preserve most of the trees, is not rejected out of hand.

(Doc. No. 17-1 at ¶ 14.)  The plaintiffs in *EPIC* sought the same type of relief and carve out, and the Ninth Circuit appears to have rejected defendant's argument in this regard as well in that case, finding that the plaintiff there would "suffer irreparable, though limited, harm" sufficient to justify reversing the lower court's denial of a preliminary injunction.  *EPIC*, 968 F.3d at 992.

Accordingly, the court is persuaded that consideration of this *Winter* factor also weighs in favor of the granting of injunctive relief.

**D.      Balance of the Hardships and Public Interest**

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.  "In assessing whether the plaintiffs have met this burden, the district court has a duty to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks and alteration omitted).  "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).  As one district court has stated:

> There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.

*Washington v. DeVos*, No. 2:20-cv-1119-BJR, 2020 WL 5079038, at *10 (W.D. Wash. Aug. 21, 2020) (citing *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

/////

1    Here, plaintiffs argue that the balance of the hardships and public interest tip sharply in

2    favor of granting the requested injunctive relief because when environmental injury is sufficiently

3    likely, the balance of the harms will usually favor an injunction in order to protect the

4    environment for the public interest.  (Doc. No. 7-1 at 10, 18–22) ("Environmental injury, by its

5    nature, can seldom be adequately remedied by money damages and is often permanent or at least

6    of long duration, *i.e.,* irreparable." *Alliance for the Wild Rockies*, 632 F.3d at 1135 (quoting

7    *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (*en banc*)).  Plaintiffs further argue

8    that the public interest here is served by enjoining the Project until USFS complies with its NEPA

9    obligations.  (Doc. No. 7-1 at 19–22.)  Plaintiffs also contend that the Project area is

10   "ecologically-critical," improperly removed trees cannot be replaced, and in contrast, USFS only

11   stands to suffer potential economic loss.  (*Id*. at 19.)

12   Plaintiffs also assert that felled trees do not pose a fire risk because USFS is already

13   "required to leave a substantial amount of large down woody material under the 2004 Sierra

14   Nevada Forest Plan Amendments. . .." and because what will be left behind will be the "bole", the

15   main trunk of a tree, which they argue is the least flammable and "generally only the limbs, tops,

16   and slash (finer fuels)" increase fire risk, which USFS intends to leave in place under the Project

17   already.  (*Id*. at 20–21.)

18   In opposition, defendant responds that the Project was developed "in response to

19   conditions caused by multiple years of drought in California," a drought that impacted large

20   swaths of forest and caused massive tree mortality.  (Doc. No. 16-3 at 3.)  According to

21   defendant, the Project is meant to target the removal of the now-dangerous trees killed by drought

22   and bark beetles (which survive on trees that are stressed due to drought/competition for limited

23   resources).  (*Id.*)  "Structurally unsound trees may collapse unexpectedly on roadways, cars, or

24   people, resulting in death or serious injury."  (Doc. Nos. 16 at 28; 16-3 at ¶¶ 11–13.)  Defendant

25   asserts that this project must continue in order to provide safe access to the Forest Roads, and in

26   particular Sherman Pass Road.  Defendant describes Sherman Pass Road as a critical road that is

27   "in most cases, the only access route to roughly 345,000 acres of National Forest System land on

28   the Kern River Ranger District of the Sequoia National Forest."  (Doc. No. 16-3 at ¶ 5.)  If that

15

1  road were to be closed (due to unsafe tree conditions) then motorists would have to drive up to

2  two to three hours more, including for first responders or those deliveries needed for fire

3  suppression efforts or evacuations because there are no intermediary, connecting roads between

4  the two ends of the Sherman Pass Road. (Doc. Nos. 16 at 29; 16-3 at ¶ 4.)  Additionally, private

5  landowners and cattle ranchers in the area might be unable to access their properties, and "cattle

6  could become trapped." (Doc. No. 16 at 29.)  USFS also asserts that the Project itself benefits the

7  public interest by reducing fuel loads and fire hazards in the area.  They argue, and all would

8  likely agree that, reducing the risk of catastrophic wildfires is clearly in the public interest.  (*Id*.)

9        Finally defendant also contends that even plaintiffs' "purportedly narrow injunction would

10  result in significant harm to the public" if USFS's contractors were unable to remove the felled

11  trees because without the financial incentive to be able to sell the trees, the contractors will not be

12  sufficiently financially incentivized to complete the on projects they have taken on.  (*Id*. at 30.)

13        Having considered the arguments of the parties, the court concludes that the balance of

14  hardships tips in favor of the granting of injunctive relief.  First, the Ninth Circuit in *EPIC* found

15  that the public interest and the balance of equities favored an injunction under very similar

16  circumstances, clearly emphasizing that USFS's obligation to comply with NEPA by preparing an

17  EIS or EA is not inconsistent with the goal of public safety.  *EPIC*, 968 F.3d at 992.  The same

18  applies here with equal force and is bolstered by the fact that plaintiffs' requested relief accounts

19  for and allows for the removal of imminently dangerous trees.  Moreover, the court is not

20  persuaded that the economic impact that USFS would face due to any delay created by complying

21  with NEPA tips the balance against granting injunctive relief.

22        Because of the hardships that the public will face if the NEPA environmental analysis is

23  not conducted, the court finds that the balance of the hardships in this case weighs in favor of

24  granting some of the injunctive relief plaintiffs seek.  However, as outlined at the hearing on the

25  pending motion, the court is concerned that plaintiffs' requested relief with regard to prohibiting

26  the removal of felled trees[8] does not weigh in the public interest because of what in the court's

27

28  _____
[8]  Plaintiffs wish to enjoin the removal of the felled trees because, according to plaintiffs, they serve as important habitat for animals such as the Pacific fishers.  (Doc. No. 7-1 at 8.)

1    view is the obvious associated fire risk. (*See, e.g.*, Doc. No. 16-3 at ¶¶ 6–7, 9, 12, 18–19.)

2        Having considered the arguments of the parties, the court concludes that the balance of

3    hardships tips in favor of the granting of injunctive relief; however, the court will not enjoin

4    USFS from being able to remove the trees that are felled in compliance with this order.

5                      **CONCLUSION**

6        For the reasons set forth above:

7      1.      Plaintiffs' motion for a temporary restraining order (Doc. No. 12) is granted;

8      2.      The court orders that defendant United States Forest Service and/or any its

9           contractors shall be restrained and enjoined from felling any trees in the Plateau

10         Roads Hazard Tree Project area, except for those trees that will imminently fall,

11         which is defined as those that (1) have been individually evaluated to have a

12         "high" or "moderate" hazard rating; and (2) are within striking distance of the

13         road, which shall be determined based on the height of the tree. To illustrate: a

14         100-foot tree evaluated as a high or moderate hazard tree may be felled only if it is

15         within 100 feet of the nearest road;

16      3.      Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, absent subsequent

17         waiver by the court, on or before Friday, July 30, 2021, plaintiffs must post a

18         $100.00 bond; and

19      4.      The parties are directed to meet and confer as to whether any further evidence or

20         briefing need be presented or whether the court may adopt this order in ruling on

21         the pending motion for preliminary injunction. The parties shall file a joint

22         response outlining their position(s) by July 30, 2021.

23    IT IS SO ORDERED.

24      Dated:    **July 23, 2021**                _Dale A. Drozd_

25                                UNITED STATES DISTRICT JUDGE

26

27

28